136 Nev., Advance Opinion 5

# IN THE SUPREME COURT OF THE STATE OF NEVADA

CLARK COUNTY OFFICE OF THE
CORONER/MEDICAL EXAMINER,
Appellant,
vs.
LAS VEGAS REVIEW-JOURNAL,
Respondent.

No. 74604

**FILED**

FEB 27 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

CLARK COUNTY OFFICE OF THE
CORONER/MEDICAL EXAMINER,
Appellant,
vs.
LAS VEGAS REVIEW-JOURNAL,
Respondent.

No. 75095

Appeal from a district court order requiring the Clark County Office of the Coroner/Medical Examiner to disclose unredacted juvenile autopsy reports under the Nevada Public Records Act (Docket No. 74604), and appeal from a post-judgment district court order awarding attorney fees and costs (Docket No. 75095). Eighth Judicial District Court, Clark County; James Crockett, Judge.

*Affirmed in part, reversed in part, and remanded (Docket No. 74604); vacated (Docket No. 75095).*

Steven B. Wolfson, District Attorney, and Laura C. Rehfeldt, Deputy District Attorney, Clark County; Marquis Aurbach Coffing and Micah S. Echols and Jacqueline V. Nichols, Las Vegas,
for Appellant.

McLetchie Law and Margaret A. McLetchie and Alina M. Shell, Las Vegas,
for Respondent.

20-07837

McDonald Carano LLP and Kristen T. Gallagher, Las Vegas,
for Amici Curiae the Reporters Committee for Freedom of the Press and 11
media organizations.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, PARRAGUIRRE, J.:

These appeals require us to interpret various provisions of the Nevada Public Records Act (NPRA) and other statutory provisions addressing public access to information concerning the deaths of children and juveniles. Specifically, we are asked to review a district court order requiring the Clark County Coroner's Office to produce unredacted juvenile autopsy reports under the NPRA. We are also asked to review the district court's award of attorney fees and costs to the Las Vegas Review-Journal (LVRJ), which had petitioned the district court to compel production of the autopsy reports after the Coroner's Office refused.

The Coroner's Office argues that it may refuse to disclose a juvenile autopsy report once it has provided the report to a Child Death Review (CDR) team under NRS 432B.407(6). We disagree. Because NRS 432B.407(6) limits access to public information, particularly information that the Legislature has determined should be generally available to the public, we interpret NRS 432B.407(6)'s confidentiality provision narrowly and conclude that it applies strictly to the CDR team as a whole and may not be invoked by individual agencies within a CDR team to limit access to information the agency holds outside of its role on the team.

 

We agree, however, with the Coroner's Office's argument that juvenile autopsy reports may include sensitive, private information and that such information may be properly redacted as privileged. In this regard, we conclude that the district court erred when it ordered the production of unredacted juvenile autopsy reports. We therefore remand for the district court to assess whether any such information that may be contained in the requested autopsy reports should be redacted under the test adopted in *Clark County School District v. Las Vegas Review-Journal*, 134 Nev. 700, 707-08, 429 P.3d 313, 320-21 (2018), and we explain the amount the Coroner's Office may collect for expending resources to provide any such redaction.

In addition, we reject the Coroner's Office's argument that NRS 239.012 immunizes a governmental entity from an award of attorney fees when the entity, in response to a records request, withholds public records in good faith. We conclude instead that NRS 239.012's immunity provision applies explicitly to damages and should be interpreted independently from NRS 239.011, which entitles a prevailing records requester to recover attorney fees and costs regardless of whether the government entity withholds requested records in good faith. Thus, a governmental entity is not immune from an attorney fees award to which a prevailing records requester is entitled under NRS 239.011. We vacate the district court's award of attorney fees to LVRJ because it is premature to determine here whether the LVRJ is the prevailing party in the underlying NPRA action.

*FACTUAL AND PROCEDURAL BACKGROUND*

In April 2017, the LVRJ submitted to the Coroner's Office a public records request under the NPRA. LVRJ sought autopsy reports, notes, and other documentation for all autopsies the Coroner's Office

performed between January 2012 and April 2017 on decedents under the age of 18 at the time of death. The Coroner's Office timely responded and informed LVRJ that the requested juvenile autopsy reports would not be produced because they contained confidential medical information. The Coroner's Office initially based its response on Attorney General Opinion 82-12 (AGO 82-12) and provided LVRJ with a spreadsheet identifying juvenile deaths that occurred in Clark County from January 2012 to the date of the request. The spreadsheet identified each decedent's name, age, race, and gender, as well as the cause, manner, and location of death.

Dissatisfied with the Coroner's Office's response, LVRJ contacted the Clark County District Attorney's Office, asserting the Coroner's Office lacked any legal authority to withhold the juvenile autopsy reports. The district attorney's office informed LVRJ that autopsy reports are released only to a decedent's next of kin, basing its response on AGO 82-12 and then-pending legislation. *See* A.B. 57, 79th Leg. (Nev. 2017). The district attorney's office further explained that A.B. 57 as proposed would codify in statute the Coroner's Office's policy of releasing autopsy reports only in limited circumstances.

LVRJ reporters and Coroner's Office representatives met to further discuss LVRJ's records request. The discussion led Clark County Coroner John Fudenberg to determine that LVRJ sought autopsy reports and records pertaining to the deaths of children who were involved with the Clark County Department of Child and Family Services. The Coroner's Office then expanded its legal basis for withholding records to include NRS 432B.407(6), which renders confidential any records or information acquired by a CDR team. The district attorney's office offered to review and redact responsive reports not considered confidential under NRS Chapter

432B, provided LVRJ was willing to pay a fee to cover the extraordinary use of personnel for redacting the reports.

LVRJ filed a petition for a writ of mandamus, requesting that the district court compel the disclosure of all juvenile autopsy reports generated between January 2012 and the date of LVRJ's April 2017 request. The district court granted LVRJ's petition and ordered the Coroner's Office to produce all records without redaction, rejecting the Coroner's Office's argument that the reports could be categorically withheld as CDR records and concluding that there was no other basis for withholding or redacting the reports. The district court further determined that because the Coroner's Office did not claim that the records were confidential under NRS Chapter 432B in its initial response, the Coroner's Office waived that argument and could not raise it later.

LVRJ thereafter moved for an award of attorney fees and costs, and the Coroner's Office opposed the motion. The Coroner's Office argued that it was immune from an award of attorney fees by virtue of NRS 239.012, which provides immunity from "damages" for disclosing or withholding records in good faith. The district court rejected the Coroner's Office's immunity argument and awarded LVRJ attorney fees and costs. These appeals followed and challenge both the district court's order compelling the Coroner's Office to produce unredacted juvenile autopsy reports (Docket No. 74604) and the district court's award of attorney fees and costs to LVRJ (Docket No. 75095).

## DISCUSSION

Primarily at issue here are questions related to the interpretation of the NPRA, NRS 239.001-.030,[1] and NRS 432B.407(6), the former generally requiring access to public records and the latter explicitly designating certain information as confidential for specific purposes relating to the review of child fatalities. We must also address whether the NPRA immunizes a governmental entity from an award of attorney fees when responding to a public records request in good faith.

When a district court's order granting a petition to compel access to records under the NPRA entails questions of law and statutory interpretation, we review the district court's order de novo. *Reno Newspapers, Inc. v. Gibbons*, 127 Nev. 873, 877, 266 P.3d 623, 626 (2011). Similarly, an attorney fee award based on an interpretation of a statute providing for attorney fee eligibility presents a question of law subject to de novo review. *In re Estate & Living Tr. of Rose Miller*, 125 Nev. 550, 552-53, 216 P.3d 239, 241 (2009). Thus, we review both orders at issue here de novo, and we begin with foundational principles informing our interpretation of the NPRA and NRS 432B.407(6).

When a statute's language is clear on its face, we must adhere to the plain meaning of such language. *City of Sparks v. Reno Newspapers, Inc.*, 133 Nev. 398, 402, 399 P.3d 352, 356 (2017). When a statute is

---

[1]We acknowledge that during the recent 2019 Legislative Session, the Nevada Legislature unanimously adopted numerous amendments to the NPRA with the passage of S.B. 287. S.B. 287, 80th Leg. (Nev. 2019). Because S.B. 287's "amendatory provisions . . . apply to all actions filed on or after October 1, 2019," we interpret in this opinion the version of the NPRA in effect at the time the instant actions were initiated. 2019 Nev. Stat., ch. 612, § 11, at 4008.

 

ambiguous, however, meaning "it is capable of being understood in two or more senses by reasonably informed persons," *Chanos v. Nev. Tax Comm'n*, 124 Nev. 232, 240, 181 P.3d 675, 680-81 (2008) (citations omitted) (internal quotation marks omitted), or when it does not speak to the particular matter at issue, we will construe it by considering reason and public policy to determine legislative intent. *Salas v. Allstate Rent-A-Car, Inc.*, 116 Nev. 1165, 1168, 14 P.3d 511, 514 (2000), as amended (Dec. 29, 2000). We "assume[ ] that, when enacting a statute, the Legislature is aware of related statutes." *City of Sparks*, 133 Nev. at 402, 399 P.3d at 356 (citation omitted) (internal quotation marks omitted). "The meaning of the words used may be determined by examining . . . the causes which induced the legislature to enact it." *McKay v. Bd. of Supervisors of Carson City*, 102 Nev. 644, 650-51, 730 P.2d 438, 443 (1986).

If possible, this court will "interpret a rule or statute in harmony with other rules or statutes." *Watson Rounds, P.C. v. Eighth Judicial Dist. Court*, 131 Nev. 783, 789, 358 P.3d 228, 232 (2015) (internal quotation marks omitted). "[T]his court has a duty to construe statutes as a whole, so that all provisions are considered together and, . . . will seek to avoid an interpretation that leads to an absurd result." *Smith v. Kisorin USA, Inc.*, 127 Nev. 444, 448, 254 P.3d 636, 639 (2011) (internal quotation marks omitted).

*A governmental entity does not waive a legal basis for withholding records by failing to cite the legal authority in its initial five-day response to a records request, if it provides some legal basis in its first response*

A governmental entity that denies a public records request for confidentiality reasons must provide, in writing, a citation to authority for its denial. NRS 239.0107(1)(d) (providing that the written notice of denial must include "[a] citation to the specific statute or other legal authority that

SUPREME COURT
OF
NEVADA

(O) 1947A

makes the public book or record, or a part thereof, confidential"). The district court concluded that because the Coroner's Office did not initially base its decision to withhold juvenile autopsy reports on NRS 432B.407(6), it could not thereafter rely on that provision to withhold the reports. We disagree with the district court's conclusion and hold that the NPRA does not provide that a governmental entity waives a legal argument it omits from its initial five-day response to a records request.

As we recently explained in *Republican Attorneys General Association v. Las Vegas Metropolitan Police Department*, 136 Nev., Adv. Op. 3, ___ P.3d ___ (February 20, 2020), the NPRA is silent as to forfeiture or waiver of a legal basis for withholding records. The NPRA simply requires the governmental entity to provide to the requester *some* legal authority for denying access to a record on the basis that the record is confidential. Because the statute is silent as to whether an omitted legal basis for withholding records is waived, we turn to legislative history to determine legislative intent.

The NPRA's legislative history indicates that the Legislature rejected a proposal providing for a governmental entity's waiver of a legal basis for withholding records when the citation was not included in the initial response to a records request. In particular, the Legislature amended the NPRA in 2007 with the passage of Senate Bill 123. *See* S.B. 123, 74th Leg. (Nev. 2007); 2007 Nev. Stat., ch. 435, § 4, at 2061-62. As introduced, section 4(2) of the bill provided that if a governmental entity denies access to a public record based on confidentiality, but in doing so "the governmental entity fails to comply with the provisions of paragraph (d) of subsection 1, the governmental entity shall be deemed to have waived its right to claim that the public . . . record is confidential." S.B. 123, 74th Leg.,

SUPREME COURT
OF
NEVADA

(O) 1947A

8

§ 4(2) (Nev., as introduced on February 20, 2007). Senator Terry Care, the bill's sponsor and a former journalist, testified that section 4(2) was drafted to ensure that "if the governmental entity responds by citing a statute, it is stuck with the original position and cannot come up with another position if the requestor petitions the court later." Hearing on S.B. 123 Before the Senate Governmental Affairs Comm., 74th Leg. (Nev., February 26, 2007) (testimony of Senator Terry Care). Section 4(2) was later removed from the bill through Amendment No. 415, and as enacted, the waiver provision was omitted in its entirety. 2007 Nev. Stat., ch. 435, § 4, at 2061-62. The Legislature thus considered and rejected the waiver provision that LVRJ urges us now to read into the NPRA.

In light of the Legislature's rejection of the waiver amendment to the NPRA, the district court incorrectly concluded that the Coroner's Office waived its reliance on NRS 432B.407(6). The NPRA does not impose such a waiver requirement; the Legislature declined to adopt it when it was proposed. Interpreting the NPRA to prohibit a governmental entity from expanding on its initial legal reasoning for withholding records would be rewriting the NPRA in a manner squarely contradicting legislative intent. We decline to do so. *See Gibbons*, 127 Nev. at 882, 266 P.3d at 629 (declining to adopt a requirement that a *Vaughn* index be provided in every NPRA dispute where such a requirement "would essentially be rewriting the NPRA because it imposes no such unqualified requirement"); *see also Century Sw. Cable Television, Inc. v. CIIF Assocs.*, 33 F.3d 1068, 1071 (9th Cir. 1994) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." (quoting *Russello v. United States*, 464 U.S. 16, 23-24 (1983))).

SUPREME COURT
OF
NEVADA

(O) 1947A

9

*NRS 432B.407(6)'s confidentiality provision, narrowly interpreted, does not trump the NPRA's provisions generally favoring access to public records*

The NPRA provides that "unless otherwise declared by law to be confidential, all public books and public records of a governmental entity must be open at all times . . . to inspection by any person, and may be fully copied." NRS 239.010(1) (2017). The NPRA serves "to foster democratic principles" and furthers the goals of "government transparency and accountability." *PERS v. Nev. Policy Research Inst.*, 134 Nev. 669, 671, 429 P.3d 280, 283 (2018) (internal quotation marks omitted); *see* NRS 239.001(1) (2017). The NPRA's provisions must be liberally construed in favor of the public's right to access government records, and "any limitations or restrictions on [that] access must be narrowly construed." *PERS*, 134 Nev. at 671, 429 P.3d at 283 (alteration in original) (quoting *Gibbons*, 127 Nev. at 878, 266 P.3d at 626); *see* NRS 239.001(3) (2015).

NRS 432B.407 is included among several hundred other statutory exceptions to the NPRA that declare certain public records to be confidential or otherwise exempt from disclosure. NRS 239.010(1) (identifying at least 461 statutory exceptions to the NPRA). Where, as here, a statute "clearly and unambiguously creates an exception" to disclosure of a public record, and provides an "affirmative grant of confidentiality," the exception or grant of confidentiality must be interpreted narrowly. *Reno Newspapers, Inc. v. Haley*, 126 Nev. 211, 215-16, 234 P.3d 922, 925-26 (2010) (narrowly interpreting the confidentiality provisions of NRS 202.3662(1)).

As its title makes clear, NRS Chapter 432B generally addresses the protection of children from abuse and neglect, and NRS 432B.403-.4095, in particular, establish the creation, organization, composition, and duties

of "multidisciplinary teams to review the deaths of children." NRS 432B.403. These multidisciplinary entities are referred to as CDR teams, which are formed to "[r]eview the records of selected cases of deaths of children under 18 years of age . . . [a]ssess and analyze such cases[,] . . . [m]ake recommendations for improvements to laws, policies and practice[,] . . . [s]upport the safety of children . . . and . . . [p]revent future deaths of children." NRS 432B.403(1)-(6). A CDR team is made up of representatives from a variety of public agencies, including law enforcement, medical care providers, educational agencies, child welfare agencies, district attorney offices, and notably here, coroner's offices. NRS 432B.406(1)(a)-(f). A CDR team may also include "such other representatives of other organizations concerned with the death of the child as the agency which provides child welfare services deems appropriate." NRS 432B.406(2).

In furtherance of its duties, NRS 432B.407(1)(a)-(d) authorize a CDR team to access certain investigatory records and information regarding a case involving the death of a child. Specifically, a CDR team may access, among other things, "[a]ny autopsy and coroner's investigative records relating to the [child's] death." NRS 432B.407(1)(b). NRS 432B.407(6) provides that "information acquired by, and the records of, a [CDR team] . . . are confidential, must not be disclosed, and are not subject to subpoena, discovery or introduction into evidence in any civil or criminal proceeding."

The Coroner's Office argues that by virtue of NRS 432B.407(6), any juvenile autopsy reports provided to a CDR team are exempt from the NPRA's disclosure requirements. More specifically, the Coroner's Office maintains that, as a representative of a CDR team, it may invoke the CDR

privilege and categorically deny access to juvenile autopsy reports on behalf of the CDR team.

Because NRS 432B.407(6) limits the disclosure of records obtained by a CDR team and designates such records as confidential, the provision must be interpreted narrowly. NRS 239.001(3) ("Any exemption, exception or balancing of interests which limits or restricts access to public books and records . . . must be construed narrowly . . . ."); *Haley*, 126 Nev. at 214-17, 234 P.3d at 924-26. By its plain language, NRS 432B.407(6) makes confidential only the records or information "acquired by" the "team." The statute's language makes no mention of the authority of individual agencies to invoke the confidentiality privilege on the team's behalf. The statute's language further applies explicitly to records or information "acquired by" the team, not to records or information held by an agency regardless of any CDR team activity. Moreover, NRS 432B.4075 refers to the "access and privileges granted to a [CDR] *team.*" (Emphasis added.) The statute applies exclusively to a CDR "team," not to the broad categories of individual public agencies that may be part of a CDR team. Narrowly interpreting the plain language of NRS 432B.407(6), as we must, we conclude that only a CDR team may invoke the confidentiality privilege to withhold information in response to a public records request, and NRS 432B.407(6) makes confidential only information or records "acquired by" the CDR team.

Our conclusion is reinforced by the CDR team's unique and essential role of obtaining and assessing information that may otherwise be withheld from it on the basis of confidentiality. In reviewing the death of a child, the CDR team must be able to access sensitive information from a variety of entities, including medical, educational, social services, and law

enforcement agencies. To enable a CDR team to access such information, NRS 432B.407(6) designates any records *acquired by the CDR team* as confidential. This is to ensure that agencies do not withhold information from the CDR team, *not* to authorize a government agency to withhold information from the public.

In addition to NRS 432B.407(6)'s plain language, the statutory scheme of NRS Chapter 432B as a whole reflects a clear legislative intent to make certain information concerning child fatalities publicly available. As noted, we are bound to consider the entirety of NRS Chapter 432B when interpreting component provisions thereof. *Smith v. Kisorin USA, Inc.*, 127 Nev. 444, 448, 254 P.3d 636, 639 (2011) ("[T]his court has a duty to construe statutes as a whole, so that all provisions are considered together . . . ." (internal quotation marks omitted)).

NRS 432B.175(1) explicitly provides, with some exceptions, that "[d]ata or information concerning reports and investigations thereof made pursuant to this chapter must be made available pursuant to this section to any member of the general public upon request if the child who is the subject of a report of abuse or neglect suffered a fatality or near fatality." The Legislature adopted this provision in 2007 with the passage of Assembly Bill 261, a bill generally requiring public agencies to share and disclose information regarding abused, neglected, or missing children. A.B. 261, 74th Leg. (Nev. 2007). In her introductory remarks as a sponsor of the legislation, then-Assemblywoman Barbara Buckley testified that A.B. 261 addressed "the disclosure of records, and *the purpose is to provide as much disclosure as possible* with regard to children who suffer fatalities or near fatalities while in the care of the child welfare system." Hearing on A.B. 261 Before the Assembly Health and Human Servs. Comm., 74th Leg. (Nev.,

SUPREME COURT
OF
NEVADA

(O) 1947A

13

March 14, 2007) (testimony of Assemblywoman Barbara Buckley) (emphasis added). Assemblywoman Buckley testified that records concerning child deaths should be accessible to "a member of the public, a relative of the child, a member of the media, or a member of a child welfare organization." *Id.* This legislative history indicates that A.B. 261 codified the Legislature's intent to make information pertaining to the deaths of children in the custody of child welfare agencies available to the public, and that the Legislature specifically contemplated ensuring the media's access to this specific category of information.

Additional testimony during the Legislature's consideration of A.B. 261 indicates the measure was intended to ensure the state's continued compliance with the Child Abuse Prevention and Treatment Act (CAPTA), federal legislation that provides grant funds to states in order to assist in improving child protective service systems.[2] To qualify for federal grant funds made available through CAPTA, states must ensure "public disclosure of the findings or information about the case of child abuse or

---

[2]*See generally* Emilie Stoltzfus, Cong. Research Serv., R40899, *The Child Abuse Prevention and Treatment Act (CAPTA): Background, Programs, and Funding*, at 17 (2009) ("In general, states must maintain the confidentiality of all records and reports related to their child abuse and neglect investigations. At the same time, a state *must* have procedures to release information from these confidential records to any federal, state, or local government entity, or an agent of these entities, that needs this information to carry out its responsibilities under law to protect children from abuse and neglect. Two of these entities, child fatality review panels and citizen review panels, are specifically named in the statute and must be given access to confidential information needed to perform their work. Further, the state is *required* to release to the public information concerning a child abuse and neglect case when it resulted in the death or near death of a child.").

neglect which has resulted in a child fatality or near fatality." 42 U.S.C. § 5106a(b)(2)(B)(x) (2012). In his testimony supporting A.B. 261, then-Director of the Nevada Department of Health and Human Services Michael Willden stated that the legislation was introduced because the state was "underreporting child fatalities to the federal government" and in order "to bring our statutes into clearer compliance with [CAPTA]." Hearing on A.B. 261 Before the Senate Human Res. & Educ. Comm., 74th Leg. (Nev., May 2, 2007) (testimony of Michael J. Willden, Director, Department of Health & Human Services); *see McKay v. Bd. of Supervisors of Carson City*, 102 Nev. 644, 650-51, 730 P.2d 438, 443 (1986) (explaining that a statute's meaning "may be determined by examining the context and the spirit of the law or the causes which induced the [L]egislature to enact it").

NRS Chapter 432B's legislative history demonstrates the Legislature's intent to make reports about, and information pertaining to, child fatalities publicly accessible as a matter of policy favoring transparency and as a matter of compliance with federal law requiring disclosure as a condition for child services grant funds. We must construe NRS 432B.407(6)'s confidentiality provision in light of NRS Chapter 432B's statutory scheme as a whole, and the Coroner's Office's argument undermines the scheme's obvious commitment to public transparency with regard to information concerning child deaths. Accordingly, we reject the Coroner's Office's broad assertion that it may invoke NRS 432B.407(6) to withhold juvenile autopsy reports on the basis that the report was provided to a CDR team.

We therefore conclude, based on the plain language of NRS 432B.407(6) and the expressed purposes behind NRS Chapter 432B, that the CDR team confidentiality provision is not intended to categorically

exempt records held by an individual CDR agency, such as the Coroner's Office, from the NPRA's disclosure requirements. Instead, we interpret NRS 432B.407(6)'s language narrowly as applying only to records acquired by the CDR team, not held by the team's constituent agencies, for the purpose of allowing the team to access the records and information it needs to review a child fatality. Nothing in this opinion precludes a governmental entity from withholding or redacting records on some other basis of confidentiality, as discussed below. We hold simply that the Coroner's Office may not rely on NRS 432B.407(6) to withhold juvenile autopsy reports or claim that such reports are categorically exempt from disclosure by virtue of a confidentiality designation applicable only to the CDR team.

*The Coroner's Office has identified nontrivial privacy interests in personal medical information contained in juvenile autopsy reports*

The Coroner's Office also argues that it may withhold juvenile autopsy reports in their entirety in order to protect sensitive personal medical information of child decedents. The Coroner's Office relies on several authorities for this proposition, including the federal Health Insurance Portability and Accountability Act (HIPAA),[3] NRS 629.021, Assembly Bill 57, a measure the Nevada Legislature passed in 2017, and Attorney General Opinion 82-12. We disagree that these authorities justify withholding juvenile autopsy reports in their entirety.

First, as the district court concluded, coroners and medical examiners are not defined as covered entities subject to HIPAA's prohibitions against disclosing medical information. *See* 45 C.F.R. § 160.103 (identifying and defining covered entities subject to HIPAA).

---

[3]42 U.S.C. § 1320d-7 (2012); 45 C.F.R. § 164.502(f)-(g) (2013).

Similarly, NRS 629.021 applies only to records "received or produced by a provider of health care." NRS 629.031, in turn, includes an exhaustive list defining "providers of health care" that does not include coroners or forensic pathologists, whose duties instead are governed by NRS Chapter 259. While we conclude that the Coroner's Office was correct to invoke HIPAA and NRS 629.021 in identifying a nontrivial privacy interest in medical information, as discussed *infra*, these authorities do not justify categorically withholding juvenile autopsy reports in their entirety.

The Coroner's Office also relied on Assembly Bill 57, adopted in 2017, which amended NRS 259.045's provisions requiring coroners to notify the next of kin of a decedent's death. The Coroner's Office argues that A.B. 57, by authorizing a coroner to release an autopsy report to certain persons who are not a decedent's legal next of kin, indicates the Legislature's tacit endorsement of the Coroner's policy restricting access to autopsy reports. A.B. 57, however, makes no mention whatsoever of confidentiality of autopsy reports or of withholding autopsy reports in response to a public records request. The bill also made no mention of other classes of parties that Clark County Coroner Fudenberg, in a sworn declaration in the proceedings below, identified as entitled to autopsy reports, including, for example, administrators or executors of an estate and law enforcement officers performing their official duties. Under the Coroner's Office's reasoning, these parties would be precluded from receiving autopsy reports because they are not identified in A.B. 57. We are not persuaded that such a result was intended. Instead, the bill appears to have been intended to *expand* rather than restrict access to autopsy reports in specific circumstances where a next of kin is the suspect in the decedent's death. 2017 Nev. Stat., ch. 108, § 3(2), at 475; *see also* Hearing on A.B. 57 Before

SUPREME COURT
OF
NEVADA

(O) 1947A

17

the Assembly Governmental Affairs Comm., 79th Leg. (Nev., March 8, 2017) (testimony of John Fudenberg, Clark County Coroner) ("[A.B. 57] will ensure that coroners statewide will be allowed to release reports to someone who is not necessarily the legal next of kin when the legal next of kin is a suspect in the death.").

While the authorities the Coroner's Office invokes do not authorize categorically withholding juvenile autopsy reports, they do implicate a significant privacy interest in medical information such that the reports may contain information that should be redacted. The NPRA forbids a governmental entity from denying a public records request on the basis of confidentiality "if the governmental entity can redact, delete, conceal or separate the confidential information from the information . . . that is not otherwise confidential." NRS 239.010(3) (2017).

We have adopted the two-part test articulated in *Cameranesi v. United States Department of Defense*, 856 F.3d 626, 637 (9th Cir. 2017) (the *Cameranesi* test) for "determin[ing] if a government entity should redact information in a public records request." *Clark Cty. School Dist. v. Las Vegas Review-Journal*, 134 Nev. 700, 707-08, 429 P.3d 313, 320-21 (2018). The first step in a *Cameranesi* analysis requires the government to establish that disclosure implicates a personal privacy interest that is nontrivial or more than de minimis. If the government shows that the privacy interest at stake is nontrivial, the requester must then show that the public interest sought to be advanced is a significant one and the information sought is likely to advance that interest. If the second prong is not met, the information should be redacted. The *Cameranesi* test thus balances "individual nontrivial privacy rights against the public's right to access public information." *Id.* at 708, 429 P.3d at 321. This balancing test

approach "ensures that the district courts are adequately weighing the competing interests of privacy and government accountability." *Id.* at 709, 429 P.3d at 321; *see also Accuracy in Media, Inc. v. Nat'l Park Serv.*, 194 F.3d 120, 123 (D.C. Cir. 1999) (explaining that the Freedom of Information Act (FOIA) protects against "unwarranted 'invasions' of privacy" and that such invasions "trigger[ ] a weighing of the public interest against the private harm inflicted," and concluding that "the release of photos of the decedent at the scene of his death and autopsy qualifies as such an invasion").

Here, the Coroner's Office has demonstrated that a nontrivial privacy interest is at stake in the potential disclosure of juvenile autopsy reports. In his sworn declaration, Clark County Coroner John Fudenberg explained that an autopsy requires a complete physical examination of the decedent, including a review of blood samples and lab results. Fudenberg explained that an autopsy may incorporate review of medical records and health history completed prior to the physical examination, and that an autopsy report will generally include "detailed descriptions and medical evaluations of the condition" of the decedent and "references to specific medical records, specific medical or health information and personal characteristics about the decedent." Such private information and personal characteristics, according to Fudenberg, may include the decedent's sexual orientation, preexisting medical conditions, drug or alcohol addiction, and various types of diseases or mental illness, as well as other personal information that the decedent or the decedent's family might wish to remain private. Fudenberg's declaration comports with a general understanding that autopsy reports may "yield detailed, intimate information about the subject's body and medical condition," *Globe Newspaper Co. v. Chief Med.*

SUPREME COURT
OF
NEVADA

(O) 1947A

19

*Exam'r*, 533 N.E.2d 1356, 1357 (Mass. 1989), and may "reveal volumes of information, much of which is sensitive medical information, irrelevant to the cause and manner of death," *Penn Jersey Advance, Inc. v. Grim*, 962 A.2d 632, 638 (Pa. 2009) (Eakin, J., concurring and dissenting).[4]

Aside from Fudenberg's declaration, the authorities the Coroner's Office invokes to withhold the autopsy reports reflect a clear public policy favoring the protection of private medical and health-related information. In its first response to LVRJ's records request, the Coroner's Office explained that its decision to withhold the reports was based on the rationale set forth in AGO 82-12, discussing the "[s]trong public policy of confidentiality of medical records." *See* 82-12 Op. Att'y Gen. 37 (1982). AGO 82-12 identified "a strong public policy that the secrets of a person's body are a very private and confidential matter upon which any intrusion in the interest of public health or adjudication is narrowly circumscribed." *Id.* at 40. Although we are not bound by AGO 82-12's conclusions of law, *see Univ. & Cmty. Coll. Sys. of Nev. v. DR Partners*, 117 Nev. 195, 203, 18 P.3d 1042, 1048 (2001), for purposes of the first step of a *Cameranesi* analysis, the Coroner's Office appropriately relied on AGO 82-12's public policy pronouncements, *Cannon v. Taylor*, 88 Nev. 89, 91-92, 493 P.2d 1313, 1314 (1972) ("While the Attorney General's opinions are not binding on [this court] . . . [o]ne of the duties of the Attorney General is to issue written

---

[4]*See also* Jeffrey R. Boles, *Documenting Death: Public Access to Government Death Records and Attendant Privacy Concerns*, 22 Cornell J.L. & Pub. Pol'y 237, 279 (2012) ("[P]rivacy concerns regarding autopsy reports are heightened due to the significant volume of highly sensitive medical information routinely contained within the reports.").

opinions upon questions of law to guide public officials."). AGO 82-12 shows that there is a personal privacy interest in medical information that is neither trivial nor de minimis.[5]

The Coroner's Office also correctly points out that NRS 432B.4095 imposes a civil penalty of up to $500 if any CDR team member, a team organized to oversee a CDR team, or the Executive Committee to Review the Death of Children discloses "any confidential information concerning the death of a child." NRS 432B.4095(1). While this provision does not render juvenile autopsy reports confidential in their entirety, it does reinforce the Coroner's Office's assertion that juvenile autopsy reports may include confidential information that should be redacted before disclosure. The NPRA contemplates that any such information should be redacted, concealed, or otherwise separated from nonconfidential information in the report. NRS 239.010(3). Accordingly, we conclude that the Coroner's Office met its burden under *Cameranesi*, and LVRJ must

---

[5]To the extent the district court's order concluded that an Attorney General opinion cannot be used as a legal basis for withholding records, we disagree. AGO 82-12 did not specifically address the distinct issue here related to juvenile autopsy reports, which, in light of NRS Chapter 432B as a whole, implicates a specific policy issue that AGO 82-12 did not contemplate. We need not address the substance of the opinion beyond concluding that it sufficiently identifies a nontrivial privacy interest in confidential medical information. We further note, however, that while Attorney General opinions are not binding legal authority, they are of persuasive legal significance and may elucidate legal questions for the purpose of guiding public agencies. This court, for instance, has found Attorney General opinions useful in determining whether records are available for inspection under the NPRA. *PERS v. Nev. Pol'y Research Inst.*, 134 Nev. 669, 674 n.4, 429 P.3d 280, 285 n.4 (2018).

show that the public interest it seeks to advance is significant and that the information sought will advance that interest.

As discussed *supra*, the public policy interest in disseminating information pertaining to child abuse and fatalities is significant. What is unclear, however, is the nature of the information contained in the juvenile autopsy reports that LVRJ seeks and how that information will advance a significant public interest. The Coroner's Office initially provided a spreadsheet to LVRJ identifying the case number; the decedent's name, gender, age, and race; and the cause, manner, and location of death for juveniles who were the subject of autopsies, and the Office also provided heavily redacted sample autopsy reports for cases not handled by a CDR team. Moreover, the CDR teams exist in part to provide information that is used to "[c]ompile and distribute a statewide annual report, including statistics and recommendations for regulatory and policy changes." NRS 432B.409(2)(f); *see, e.g.*, Exec. Comm. to Review the Death of Children, Nev. Div. of Child & Fam. Servs., *2016 Statewide Child Death Report* (2016). It is unclear what *additional* information LVRJ seeks to glean from the requested juvenile autopsy reports that, in unredacted form, would advance the public's interest.

Accordingly, we remand for the district court to determine, under the *Cameranesi* test, what autopsy report information should be disclosed under the NPRA and what information should be redacted as private medical or health-related information.

*The NPRA explicitly limits an "extraordinary use" fee to 50 cents per page*

The Coroner's Office argues that it is entitled to charge a fee for the "extraordinary use" of personnel who must review and redact the juvenile autopsy reports before disclosing them. *See* NRS 239.055(1). The

Coroner's Office estimated that it would require two employees to spend 10 to 12 hours reviewing and redacting the reports, and it requested that LVRJ pay $45 per hour for the staff review. The district court concluded that the Coroner's Office could not charge the $45-per-hour fee and limited any recoverable costs to the actual costs of producing electronic copies on a CD. We conclude that the Coroner's Office is not entitled to charge a fee for the privilege review in excess of the 50 cents-per-page cap imposed by the NPRA for extraordinary use of personnel.

The NPRA provides that a governmental entity may recover a fee for providing a copy of a public record, not to exceed 50 cents per page. NRS 239.052(4). In 2017, the NPRA also provided for an additional fee to be charged for "extraordinary use" of resources:

> [I]f a request for a copy of a public record would require a governmental entity to make extraordinary use of its personnel or technological resources, the governmental entity may, in addition to any other fee authorized pursuant to this chapter, *charge a fee not to exceed 50 cents per page for such extraordinary use.* Such a request must be made in writing, and upon receiving such a request, the governmental entity shall inform the requester, in writing, of the amount of the fee before preparing the requested information. The fee charged by the governmental entity must be reasonable and must be based on the cost that the governmental entity actually incurs for the extraordinary use of its personnel or technological resources. The governmental entity shall not charge such a fee if the governmental entity is not required to make extraordinary use of its personnel or technological resources to fulfill additional requests for the same information.

NRS 239.055(1) (2013) (emphasis added) (repealed 2019); *see* 2019 Nev. Stat., ch. 612, § 13, at 4008. The NPRA, by its plain language, limits any fee recoverable for the "extraordinary use" of personnel to "50 cents per page." NRS 239.055(1) is a specific provision dealing precisely with the topic of a governmental entity's "extraordinary use" of personnel to "prepar[e] the requested information" in response to a public records request. It is unmistakable from the plain language that the 50-cent cap applies to a fee "for such extraordinary use." Such a provision, applying specifically to fees for "extraordinary use," must control over any other provision providing generally for permissible fees associated with producing a public record. *In re Resort at Summerlin Litig.*, 122 Nev. 177, 185, 127 P.3d 1076, 1081 (2006) ("[W]here a general statutory provision and a specific one cover the same subject matter, the specific provision controls."); *State, Div. of Ins. v. State Farm Mut. Auto Ins. Co.*, 116 Nev. 290, 293, 995 P.2d 482 485 (2000) (explaining that statutory language that is "plain and unambiguous" leaves "no room for construction" (internal quotation marks omitted)).

In this instance, to permit the Coroner's Office to charge $45 per hour for staff to review the requested reports before disclosing them, and to allow such costs as "extraordinary use" costs, would be to flatly ignore the plain language of NRS 239.055(1) explicitly limiting fees that may be assessed specifically for "extraordinary use" of personnel. The Coroner's Office may charge a fee for extraordinary use of personnel or technological services, and it may inform a requester, in writing, of the amount of such a fee "before preparing the requested information." NRS 239.055(1). But the fee is expressly limited to 50 cents per page, it "must be reasonable," and it "must be based on the cost[s] [the Coroner's Office] actually incurs for the

SUPREME COURT
OF
NEVADA

(O) 1947A

24

extraordinary use of its personnel." *Id.* This court is not at liberty to set aside, disregard, or rewrite the NPRA's explicit limitations on fees recoverable for a governmental entity's extraordinary use of personnel.

*The NPRA does not immunize a public entity from an award of attorney fees*

The Coroner's Office argues that it is immune from an award of attorney fees because it withheld the requested autopsy reports in good faith. Specifically, the Coroner's Office contends that NRS 239.011(2) and NRS 239.012 must be interpreted together, such that NRS 239.012's immunity from "damages" provision must be read to encompass NRS 239.011's attorney fees provision. Interpreting NRS 239.011(2)'s language as "explicit and plain," the district court concluded that LVRJ was entitled to attorney fees as a prevailing party in its NPRA action. We review the district court's conclusions of law de novo. *Logan v. Abe,* 131 Nev. 260, 264, 350 P.3d 1139, 1141 (2015) (holding when eligibility for a fee award depends on interpretation of a statute or court rule, the district court's decision is reviewed de novo). We affirm the district court's order insofar as it correctly interpreted NRS 239.011(2) as entitling a prevailing records requester to attorney fees regardless of whether the governmental entity responds in good faith to a public records request.

NRS 239.011(2) provides that in an action to obtain access to public records, "[i]f the requester prevails, the requester is *entitled* to recover . . . costs and reasonable attorney's fees in the proceeding from the governmental entity whose officer has custody of the book or record." (Emphasis added.) NRS 239.012 provides that "[a] public officer or employee who acts in good faith in disclosing or refusing to disclose information and the employer of the public officer or employee are immune from liability for damages, either to the requester or to the person whom

the information concerns." The plain language of both provisions compels reading them independent of one another, such that eligibility for attorney fees does not depend on the good-faith response of the governmental entity, but solely on whether the requester is a prevailing party.

As defined by *Black's Law Dictionary*, the term "entitle" means "[t]o grant a legal right to or qualify for," *Entitle, Black's Law Dictionary* (11th ed. 2019), and an "entitlement" is defined as "[a]n absolute right to a (usually monetary) benefit . . . granted immediately upon meeting a legal requirement," *Entitlement, Black's Law Dictionary* (11th ed. 2019). The statute's language plainly provides that if LVRJ is the prevailing requester, it has met the sole legal requirement which qualifies it for, or makes it "entitled to," reasonable attorney fees and costs. *See also Las Vegas Metro. Police Dep't v. Blackjack Bonding, Inc.*, 131 Nev. 80, 82, 343 P.3d 608, 610 (2015) (holding a records requester "was a prevailing party and thus entitled to recover attorney fees and costs pursuant to NRS 239.011").

NRS 239.012, on the other hand, by its plain language deals with governmental immunity from civil "damages" for good-faith disclosure of information. We have interpreted "damages" in other governmental immunity statutes to exclude an award of attorney fees. *See Las Vegas Metro. Police Dep't. v. Yeghiazarian*, 129 Nev. 760, 768-69, 312 P.3d 503, 509 (2013) (allowing recovery of attorney fees in addition to damages subject to NRS 41.035's cap); *Arnesano v. State, Dep't of Transp.*, 113 Nev. 815, 821, 942 P.2d 139, 143 (1997). Because NRS 239.012 relates specifically to governmental immunity, "damages" as used in this provision must be interpreted consistently with our interpretation of "damages" as used in other governmental immunity statutes. *See Savage v. Pierson*, 123 Nev. 86, 94, 157 P.3d 697, 702 (2007) ("[W]hen the same word is used in different

statutes that are similar in respect to purpose and content, the word will be used in the same sense, unless the statutes' context indicates otherwise . . . .").

The Coroner's Office argues that interpreting "damages" independently would yield an absurd result, because other than the attorney fees provided for in NRS 239.011(2), there is no other type of "damages" that could flow from a governmental entity withholding a public record or other information in good faith. In light of the Coroner's Office's privacy argument, with which we partly agree, it is not difficult to conclude that "damages" as used in NRS 239.012 contemplates civil damages, not attorney fees. As we discussed in *Clark County School District v. Las Vegas Review-Journal*, "Nevada's common law recognizes the tort of invasion of privacy for unreasonable intrusion upon the seclusion of another. The purpose of the tort is to provide redress for intrusion into a person's reasonable expectation of privacy . . . ." 134 Nev. at 708, 429 P.3d at 320 (citations omitted). We decline to speculate as to whether the Legislature conceived of specific privacy-based or other causes of action when enacting NRS 239.012's immunity provision. A prevailing requester's entitlement to attorney fees and costs does not depend on whether the government withheld the requested records in good faith. Here, however, it is premature to conclude whether LVRJ will ultimately prevail in its NPRA action. The district court must decide the extent to which the juvenile autopsy reports contain private information that the Coroner's Office should redact. We conclude that NRS 239.012, as a matter of law, immunizes a governmental

entity from "damages," and that the term does not encompass attorney fees and costs.[6]

## CONCLUSION

We conclude that the Coroner's Office has not demonstrated that NRS 432B.407(6), or any other authority, authorizes it to withhold juvenile autopsy reports in their entirety in response to a public records request. To the extent that the requested reports may contain private information or confidential medical information, we remand for the district court to evaluate under *Cameranesi* the scope of information that should be redacted from the reports. While NRS 239.012 does not immunize the Coroner's Office from an award of attorney fees as a matter of law, we nonetheless vacate the district court's award of attorney fees because it cannot yet be determined whether LVRJ is a prevailing party in its underlying NPRA action.

In light of the foregoing, we affirm the district court's conclusion that the Coroner's Office may not rely on NRS 432B.407(6) to withhold juvenile autopsy reports in their entirety in response to a public records request. We further affirm the district court's conclusion that NRS 239.012 does not immunize a governmental entity from an award of attorney fees to which a prevailing records requester in a public records action is entitled. We reverse the district court's order requiring production of unredacted juvenile autopsy reports, and we remand for the district court to assess the extent to which the reports may contain private information and medical or

---

[6]In light of our decision to reverse and remand for further proceedings, we leave to the sound discretion of the district court the determination of whether LVRJ is entitled to attorney fees as the prevailing party in this action.

other health-related information that should be redacted. Finally, because it is not yet determined what information LVRJ will ultimately obtain as a result of its petition, we cannot yet conclude whether LVRJ is a prevailing party, and we accordingly vacate the district court's order awarding attorney fees to LVRJ.

_____, J.
Parraguirre

We concur:

_____, C.J.
Pickering

_____, J.
Gibbons

_____, J.
Hardesty

_____, J.
Stiglich

_____, J.
Cadish

_____, J.
Silver