**[J-9-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| SEDA-COG JOINT RAIL AUTHORITY, | : | No. 12 MAP 2019 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court dated May 3, |
| | : | 2018, Reargument denied June 28, |
| v. | : | 2018, at No. 617 CD 2017 Reversing |
| | : | the Order of the Clinton County Court |
| | : | of Common Pleas, Civil Division, |
| CARLOAD EXPRESS, INC., | : | dated May 11, 2017 at No. 2015-CV- |
| SUSQUEHANNA UNION RAILROAD | : | 933 and Remanding for entry of |
| COMPANY, AND NORTHERN PLAINS | : | summary judgment |
| RAILROAD, INC., | : | |
| | : | ARGUED: March 11, 2020 |
| Appellees | : | |

**OPINION**

**JUSTICE DONOHUE**                                                   **DECIDED: October 1, 2020**

This case involves the interpretation of the majority vote standard set forth in

Section 5610(e) of the Pennsylvania Municipality Authorities Act, 53 Pa.C.S. §§ 5601-

5623 ("MAA"), and the interplay between the MAA and the common law rule that only a

majority of members present and voting is required to take action. Section 5610(e)

provides in relevant part as follows:

> (e) Quorum.--A majority of the members shall constitute a
> quorum of the board for the purpose of organizing and
> conducting the business of the authority and for all other
> purposes, and all action may be taken by vote of a majority of
> the members present unless the bylaws shall require a larger
> number. …

53 Pa.C.S. § 5610(e). Here, the question is whether Section 5610(e) mandates that six present but recused Board members of a sixteen-member Board count in the calculation of the total number of Board members required for a majority. Stated otherwise, are nine votes (a majority of the sixteen members) required to take action, or conversely, are seven of the ten votes actually cast sufficient for approval of the action. This Court granted discretionary appeal to determine whether Section 5610(e) of the MAA's use of the phrase "members present" abrogates the common law rule that a simple majority (a majority vote of the voting members who make up the quorum of a municipal authority) carries a vote. Because we conclude, for the reasons that follow, that it does not, we affirm the order of the Commonwealth Court.

## I. Factual and Procedural Background

Appellant SEDA-COG Joint Rail Authority (the "JRA") is a joint authority formed in 1983, pursuant to the MAA, to protect rail customers throughout central Pennsylvania and to promote industrial and economic development throughout the region. The JRA is governed by a sixteen member Board, with each of the eight member counties (Centre, Clinton, Columbia, Lycoming, Mifflin, Montour, Northumberland, and Union) appointing two members to the Board. In addition to the MAA, the Board's operations are governed by the JRA's bylaws and a code of conduct. The JRA is the owner of approximately 200 miles of rail lines and various facilities, which are operated via its private-public partnership with a third-party operator. The most recent third-party operator, acting pursuant to an operating agreement dated January 1, 2007, was appellee Susquehanna Union Railroad Company ("SURC"). Because its operating agreement with the JRA was

set to expire on June 30, 2017, the JRA initiated the process to award a new operating agreement.

The request for proposal process involved two phases. During Phase One, JRA Board members were tasked with reviewing and scoring the qualifications of those operators submitting proposals, with the top three candidates proceeding to Phase Two, at which time the Board would vote to select which entity would be awarded the new operating agreement. At the outset of this process, the Board accepted the voluntary recusals of six Board members, each of whom indicated that they would not participate in the selection process in order to avoid any appearance of bias and reduce the likelihood of potential litigation.[1] The remaining ten members of the Board were tasked with reviewing, evaluating, and scoring the proposals submitted by the interested parties. At the end of Phase One, the ten voting members, by a count of seven-to-three, voted to invite the four highest scoring proposers to Phase Two.[2] When this vote took place, general counsel for the JRA questioned whether seven votes were sufficient to take action, and it was agreed that the Board would consider the issue at a subsequent meeting. *Id.* at 14.

At the October 8, 2014 Board meeting, the JRA's counsel announced because the Board had sixteen members, a nine-vote majority was required for the Board to act. The

---

[1] Five of the six abstaining members had employment ties to shippers on JRA-owned lines, and the sixth had a small ownership stake in a non-operating railroad that connected to the lines. SEDA-COG JRA Meeting Minutes, 8/13/2014, at 13.

[2] Due to a tie for third place, four proposers initially proceeded to Phase Two.

ten voting members, in order to ratify the Phase One action, voted unanimously to do so.[3]

Moving on to Phase Two, the participating Board members evaluated detailed proposals by the top four proposers. At the end of the analysis, Carload received twenty-four points, SURC received twenty-three, and Northern Plains Railroad received thirteen.[4] A roll call vote was taken on the motion to award the contract to Carload and, of the ten voting Board members, seven voted in favor and three against. When certain Board members questioned the nine vote requirement for action, the Board voted unanimously to table the decision to award the operating agreement to Carload pending further review of the JRA's bylaws and the applicable law.

After the meeting, Carload submitted its position in writing to the JRA, arguing that it had been awarded the operating agreement based upon the seven-to-three vote. The JRA responded on September 23, 2015 by filing an action for declaratory judgment requesting a declaration upholding its use of the nine vote requirement.[5] Carload filed an

---

[3] At this point in time, none of the Phase Two proposers, including Carload, had challenged the Board's interpretation of the MAA as requiring nine votes for the Board to act. The Commonwealth Court held that under the facts presented, this failure did not constitute waiver. *Seda-Cog Joint Rail Auth. v. Carload Express, Inc.*, 185 A.3d 1232, 1239 (Pa. Commw. 2018), *appeal granted in part*, 201 A.3d 143 (Pa. 2019). The Commonwealth Court rejected the JRA's assertion that Carload acquiesced to the requirement of nine votes by failing to object to it when it was first announced and was therefore estopped from challenging it on appeal. *Id.* at 1238-39. The Commonwealth Court explained that "[e]stoppel requires not only misleading words or silence by the party to be estopped, but reasonable reliance on such words or silence by the party asserting the estoppel," and that the JRA has "aver[red] no facts that genuinely support such reliance or demonstrate any detriment suffered as a result." *Id.* at 1240. This Court declined to grant allocatur review on this issue.

[4] The fourth proposer in Phase Two, Genesee & Wyoming Railroad Services, Inc., had withdrawn from consideration.

[5] The Authority named all three of the Phase Two proposers as defendants in its complaint. Northern Plains Railroad, Inc., the third highest scoring candidate, withdrew

answer denying the material allegations in the JRA's complaint and asserting, inter alia, a counterclaim in declaratory judgment seeking a ruling that the vote of the JRA on July 8, 2015 passed the motion to award the operating agreement to Carload Express and that as a result Carload was entitled to the immediate execution of that agreement by the JRA.  On November 1, 2016, the JRA filed a motion for summary judgment on Carload's complaint and the JRA's counterclaim and on December 6, 2016, Carload filed a cross-motion for summary judgment (seeking judgment on its counterclaim for declaratory judgment and also on the JRA's cause of action for declaratory judgment).  On May 11, 2017, following briefing and argument on the motions, the trial court granted the JRA's motion and denied Carload's cross-motion.

In granting the JRA's motion for summary judgment, the trial court reviewed the above undisputed facts and examined the MAA, determining that it applied to this case. The trial court stated that the proper voting standard hinged upon the meaning given to the word "present" in Section 5610(e), a term that is not defined in the MAA or in the Pennsylvania Statutory Construction Act.  *Id.* at 9.  The trial court applied two rules of statutory construction:  that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," *id.* (quoting 1 Pa.C.S. § 1903(a)); and "[a]bsent a statutory definition, we construe statutory words according to their ordinary usage."  *Id.* (quoting *Penn Jersey Advance, Inc. v. Grim*, 962 A.2d 632, 637 n.6 (Pa. 2009)).  The trial court decided that the proper method for identifying the number

---

its proposal and has not participated in the lawsuit.  On December 1, 2016, SURC filed an answer to the JRA's motion for summary judgment, asking the trial court to grant it.  In the alternative, SURC also filed a counterclaim requesting (1) a declaration that the six board members who recused themselves did so without any reasonable basis for doing so, and (2) ethics violations by one board member of the Board.

of votes needed for the JRA to act was "to determine how many members were 'present' and then determine what a majority of that number would be." *Id.* at 10. Because all sixteen members of the JRA were present at the relevant Board meeting, the trial court ruled that that a nine vote majority was required for the JRA to take action. *Id.*

The trial court rejected Carload's assertion that the trial court should apply the common law quorum rule (the "common law rule"). According to the common law rule, no more than a majority of the members present and voting is required to take action, even if the result is a plurality vote potentially carrying a motion. That rule was inapplicable, according to the trial court, because this Court has held that it "will construe statutes dealing with the number of votes required for action by a municipal body without any presumption in favor of the common law rule." *Id.* at 9-10 (quoting *Commonwealth ex rel. Bagnoni v. Klemm*, 454 A.2d 531, 532 (Pa. 1982)). The trial court explained that the common law rule would require courts to read the words "and voting" into Section 5610(e) of the MAA. Such reading "would clearly change the meaning of the voting language by adding another word," and would, by extension, abrogate the intention of the Legislature in drafting the statute." *Id.*

On appeal, a unanimous panel of the Commonwealth Court reversed, holding that Section 5610(e) incorporates the common law rule into the MAA and that as a result the seven-to-three vote constituted a majority sufficient to approve Board action. *Seda-Cog Joint Rail Auth. v. Carload Express, Inc.*, 185 A.3d 1232, 1240 (Pa. Commw. 2018), *appeal granted in part*, 201 A.3d 143 (Pa. 2019). The Commonwealth Court explained that when a post-1937 statute is substantially a reenactment of a pre-1937 statute, the rule of strict construction will continue to apply." *Id.* (citing *Commonwealth v. Chiappini*,

782 A.2d 490 (Pa. 2001) and 1 Pa.C.S. § 1962). Because Section 5610(e) of the MAA is a substantial reenactment of a pre-1937 statutory provision (Act of June 28, 1935, P.L. 463, No. 191), it is presumed to follow the common law and "must be strictly construed." *Id.* Under the common law rule, a majority of those present and voting may act on behalf of the body "even if, because of abstentions, the majority of the affirmative votes constitutes only a plurality of the members in attendance." *Id.* at 1236-37 (citing, e.g., *DiGiacinto v. Allentown*, 406 A.2d 520 (Pa. 1979)).

Based upon its analysis, the Commonwealth Court identified the critical issue in the case as whether the General Assembly's inclusion of the word 'present' expressly alters the [c]ommon [l]aw [r]ule." *Id.* at 1237. The Commonwealth Court explained that this Court in *Bagnoni*, and the Commonwealth Court in *McAdoo Borough,* 469 A.2d 693 (Pa. Commw. 1983), *rev'd on other grounds*, 485 A.2d 761 (Pa. 1984), "concluded that statutory language substantially the same as that at issue here did not abrogate the common law regarding a determination of majority votes." *Id.* at 1238 (citing *Bagnoni*, 454 A.2d at 534; *McAdoo Borough*, 469 A.2d at 696 n.8). The Commonwealth Court thus concluded that because Section 5610(e) of the MAA required the application of common law voting principles unless the entity's bylaws required a different methodology, and indicating that it had not identified any contrary provisions in the JRA's bylaws, the seven-to-three vote was effective to award the operating agreement to Carload. *Id.* at 1238-39. In its written order, the Commonwealth Court reversed the decision of the trial court and ordered the case to be remanded to the trial court with instructions to enter summary judgment in favor of Carload.

SURC subsequently filed a motion for reargument requesting, inter alia, clarification with respect to its remand order since there were matters pending in the trial court because the appeal was interlocutory as of right pursuant to Pa.R.A.P. 311(a)(8) and Section 7532 of the Declaratory Judgments Act, 42 Pa.C.S. § 7532. In response, on June 28, 2018, the Commonwealth Court granted the motion in part in a manner not impacting its resolution of the issues now pending before this Court.

This Court granted appeal to address the following questions:

> (1) Did the [p]anel err by disregarding the plain language of the Municipality Authorities Act ("MAA"), 53 Pa.C.S. § 5610(e) which expressly requires a vote by the majority of "members present" for an authority to take action, instead applying a common law quorum rule that has never applied to MAA authorities or to discretionary contracting processes, effectively superimposing the words "and voting" into the statute?
>
> (2) Did the [p]anel err by ignoring this Supreme Court's elimination of any presumption in favor of the common law voting rule for representative bodies of limited membership as well as operative provisions of the Statutory Construction Act ("SCA"), on the basis that the MAA was a pre-1937 enactment, where no applicable jurisprudence supports applying the common law rule to MAA authorities or discretionary procurement processes?
>
> (3) Did the [p]anel apply an incorrect standard of review and improperly subvert the discretion of [the] JRA and its individual public official board members by superimposing a different voting standard than that chosen by [the] JRA for its discretionary procurement process, which tracks the language of 53 Pa.C.S. § 5610(e)[,] and by ignoring the affirmative provisions of the RFP and the voting standard announcement?

*SEDA-COG Joint Rail Auth. v. Carload Express, Inc.,* 201 A.3d 143, 143–144 (Pa. 2019).

Appellate review of summary judgment entails a question of law. *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 162 A.3d 327, 340 (Pa. 2017). We review the Commonwealth

Court's reversal of the trial court's order de novo, and we need not defer to either lower tribunal's determinations. *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010). In reviewing the lower courts' rulings, we apply the same legal standard as the trial court, namely that summary judgment is appropriate only in those cases where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Albright v. Abington Mem. Hosp.*, 696 A.2d 1159, 1165 (Pa. 1997). In the present case, this determination requires statutory interpretation, which likewise presents a question of law for which our standard of review is de novo and our scope of review is plenary. *Spahn v. Zoning Bd. of Adjustment*, 977 A.2d 1132, 1142 (Pa. 2009).

## II. The Arguments of the Parties

The JRA argues that the Commonwealth Court disregarded the plain language of Section 5610(e) by inserting the words "and voting," when interpreting the provision.[6] It notes that Section 5610(e) does not include any language that indicates that members present but abstaining should be disregarded when applying the voting standard. JRA's Brief at 46. The JRA reads Section 5610(e) as providing that while a simple quorum may organize and conduct a meeting, action may only be taken by the vote of a majority of the members physically "present.'" *Id.*

---

[6] SURC filed a brief in support of the JRA which focuses on the same arguments as those made by the JRA. Amicus Pennsylvania Municipal Authorities Association submitted a brief arguing that the Commonwealth Court's decision was contrary to the plain language of Section 5610(e) of the MAA. Amicus Pennsylvania Municipal Authorities Association's Brief at 6. The eight counties that make up the JRA ("the Counties") also filed an amicus brief, echoing the JRA's concerns about adequate representation and argue that the Commonwealth Court's decision "eviscerates the intent of the [MAA] by permitting a decision to be taken by a minority of representatives present at a given meeting." Amicus Counties' Brief at 2.

Alternatively, the JRA contends that the Commonwealth Court failed to apply the narrow scope of review – limited to reversing only where the authority engaged in "flagrant and manifest abuses of discretion." JRA's Brief at 25-26. In this regard, the JRA contends that a deferential standard of review is required when it exercises its proprietary, rather than its governmental, functions. *See id.* at 32-39. It also asserts that the Commonwealth Court erred by disregarding several operative provisions in the JRA's written RFP document, specifically those provisions that authorized JRA to employ a process requiring nine votes. *Id.* at 27-30. Finally, the JRA argues that the panel's decision substantially undermines the goal of adequate representation of all member counties because it allows a plurality of votes to be sufficient for the award of a contract. *Id.* at 65-66.

For its part, Carload's analysis is largely devoted to supporting the Commonwealth Court's interpretative analysis. To this end, Carload proffers several reasons to affirm. First, the Commonwealth Court correctly held that Section 5610(e) does not depart from the common-law voting rules, as Section 5610(e) does not require anything more than a simple majority. Carload's Brief at 13. Second, Section 5610(e) is a reenactment of a pre-1937 statute, and this Court has held that statutes reenacting pre-1937 statutes should be strictly construed. *Id.* Third, the Commonwealth Court recognized that under the MAA, the JRA has no discretion to impose a higher voting standard without amending its bylaws. *Id.*

### III. Analysis

#### A. The Common Law Voting Standard

Under the common law voting standard, once a quorum is achieved, a simple majority of the votes cast may act on behalf of the body, including representative

municipal bodies of limited membership of the type at issue here. As explained by this Court in *DiGiacinto v. City of Allentown*, 406 A.2d 520 (Pa. 1979),

> [u]nder the common law rule so long as a quorum is present at a meeting, all that is required is that the highest vote be equal to a majority of the quorum number, even though the highest vote constitutes only a plurality of all the legal votes cast. This is true even if more than the quorum number is present at the meeting. For example, if there are seven members of a body and four of those members constitute a quorum and attend a meeting, a majority of the four, which would be three, is necessary to take official action of any kind. Even if all seven members, more than the necessary quorum of four, attend the meeting, the same number of votes, namely three, is all that is necessary to take official action if that is the highest number of votes cast (plurality) in a given matter. Thus, if the minimum quorum of four is present, and the vote on a particular proposal is 3 in favor and 1 against, the proposal is adopted. If all seven members of the body attend and the vote on a particular proposal is 3 in favor, 1 against and 3 abstentions, the proposal is likewise adopted by the plurality vote.

*Id.* at 522 (emphasis added); *Stoltz v. McConnon*, 373 A.2d 1096, 1099 (Pa. 1977) ("Pennsylvania courts have repeatedly applied the common-law rule to representative municipal bodies of limited membership in the absence of [a]ny language to the contrary in the relevant enabling statute."); *Raynovich v. Romanus*, 299 A.2d 301, 304 (Pa. 1973); *Meixell v. Hellertown Borough Council*, 88 A.2d 594, 596 (Pa. 1952); *Commonwealth ex rel. Fortney v. Wozney*, 192 A. 648, 650 (Pa. 1937); *Frackville Borough Council Case*, 162 A. 835, 836-37 (Pa. 1932); *Commonwealth v. Fleming*, 23 Pa. Super. 404, 408-09 (1903).[7]

---

[7] In *Bagnoni*, 454 A.2d 531 (Pa. 1982), the Court indicated that the application of the common law standard may depend upon the type of body at issue, e.g., representative bodies of limited membership (e.g. municipal boards) as opposed to e.g., general public elections. *Bagnoni*, 454 A.2d at 532. In support of this proposition, the Court cited only

The application of this common law rule is modified if the number of votes cast exceeds the quorum number. In this circumstance, the majority of votes required for an action is a majority of the votes cast. As we stated in *DiGiacinto*, "[e]ven if all seven members, more than the necessary quorum of four, attend the meeting, the same number of votes, namely three, is all that is necessary to take official action **if that is the highest number of votes cast (plurality) in a given matter**." *DiGiacinto,* 406 A.2d at 522 (emphasis added). In this regard, we made clear that that the majority may not be taken from those members who are merely present, but rather those members who are both present **and voting**. As the relevant example in *DiGiacinto* demonstrates, "[i]f all seven members of the body attend and the vote on a particular proposal is 3 in favor, 1 against and 3 abstentions, the proposal is likewise adopted by the plurality vote." This is because

to Section 1928(a) of the Statutory Construction Act, which provides that statutes enacted after September 1, 1937 are not strictly construed in favor of the common law. Section 1928(a) makes no distinction based on the subject matter of any post-1937 statute, and it most obviously does not expressly speak to voting standards prescribed by statute.

The Court in *Bagnoni* cited to *Stoltz* for the proposition that statutes setting forth voting standards for representational bodies are not as rigorously challenged for abrogations of the common law. *Stoltz*, 373 A.2d at 1099-1100. However, the *Stoltz* court did not make any principled distinction between representative bodies of limited membership and other voting assemblies, noting that "Pennsylvania courts have repeatedly applied the common-law rule to representative municipal bodies of limited membership in the absence of Any language to the contrary in the relevant enabling statute," and indicated that whether the General Assembly intended to abrogate the common law in any particular instance "depends on the statutory language itself." *Id.* at 1099.

At bottom, it is unclear why the Court in *Bagnoni* and *Stoltz* was concerned with abrogation of common law principles at all. The statutes at issue in those cases were enacted well after 1937 and thus, pursuant to Rule 1928(a), the rule of strict construction vis-à-vis common law voting principles had no application when interpreting their proper application. Those statutes were to be interpreted based solely upon the language set forth therein, with no presumption that the common law was intended to apply in contrast with pre-1937 statutes, and repealed/reenacted pre-1937 statutes of the type at issue here.

the abstentions do not count towards the total number of votes from which a majority vote must be obtained – if only four members vote, a majority (three) is determined from that number.

At common law, the reason why a majority is determined from the votes actually cast rather than from those merely present is because "[i]f the rule were otherwise, a member could attend the meeting and abstain from voting and have a different effect than if that person were absent from the meeting." *DiGiacinto*, 406 A.2d at 522. Similarly, in *Meixell*, we provided that a member who attends a meeting but fails to vote can have the same "paralytic effect as one who is absent":

> [O]ne or a relatively few persons could, by their intentional absence from, or by their presence at a meeting and their failure to vote, or their casting a blank or illegal ballot, block indefinitely an important election or important legislation and thus paralyze government with obviously great harm to the public interest.

*Meixell*, 88 A.2d at 596; *see also Heuchert v. State Harness Racing Comm'n,* 170 A.2d 332, 337 (Pa. 1961) ("[U]nder our form of government the majority prevails, and those unable or unwilling to vote must be bound by the vote cast."); *Commonwealth ex rel. Fortney v. Wozney*, 192 A. 648, 649-50 (Pa. 1937); *Ronald H. Brown Charter Sch. v. Harrisburg City Sch. Dist.*, 928 A.2d 1145, 1148 (Pa. Commw. 2007) (under the common law, an abstaining member cannot demand that majority vote requirement count that member's presence); *Cmty. Coll. of Beaver Cty. v. Aliquippa Sch. Dist.*, 287 A.2d 844 (Pa. Commw. 1972) ("The rationale of this rule is that there is no way in which to compel the vote of all competent electors and those who are unwilling or unable to vote must be bound by the Majority vote of those who do cast a vote."); *see generally* 59 Am.Jur.2d Parliamentary Law § 15 (2019) ("The exercise of lawmaking power is not stopped by the

abstention of some who are present. If members present desire to defeat a measure, they must vote against it. Inaction will not accomplish their purpose. Their silence is acquiescence rather than opposition.").

If these common law rules apply in the present case, the vote of the JRA Board by seven to three in Carload's favor must stand. In accordance with Section 5610(e), the Board consists of sixteen members, and a majority of that number (nine) constitutes a quorum. Because ten members of the Board actually voted, however, the required number of votes for a majority was six. As seven Board members voted in Carload's favor, the action carried. We thus turn to the question as to whether Section 5610(e) codified the common law rules.

## B. The Presumption that Section 5610(e) Codifies the Common Law Voting Rules

The language regarding voting standards in Section 5610(e) discussed here has existed since 1935. The original enabling legislation for municipal authorities was the Municipality Authorities Act of 1935 (the "1935 MAA Act"),[8] which provided that "Three members shall constitute a quorum of the board for the purpose of organizing the Authority and conducting the business of thereof and for all other purposes, and all action shall be taken by a vote of **a majority of the members present**, unless in any case the bylaws shall require a larger number." The 1935 MAA Act was simultaneously repealed and replaced by the Municipality Authorities Act of 1945 (the "1945 MAA Act"),[9] which similarly held that "A majority of the members shall constitute a quorum of the board for the purpose of organizing the Authority and conducting the business thereof and for all

---

[8]  Act of June 28, 1935, P.L 463, No. 191.

[9]  Act of May 2, 1945, P.L 382, No. 164.

other purposes, and all action may be taken by a vote of **a majority of the members present**, unless in any case the bylaws shall require a larger number."  In 2001, the relevant language in the 1945 MAA Act was codified at 53 Pa.C.S. § 5610(e), namely that "A majority of the members shall constitute a quorum of the board and conducting the business thereof and for all other purposes, and all action may be taken by a vote of **a majority of the members present**, unless the bylaws shall require a larger number."  53 Pa.C.S. § 5610(e).

Critical to the present appeal, three provisions of the Statutory Construction Act, 1 Pa.C.S. §§ 1501-1991, must be considered in this interpretative analysis.  Section 1928(b)(8) provides that "[p]rovisions enacted finally prior to September 1, 1937 which are in derogation of the common law[]" are to be "strictly construed."  1 Pa.C.S. § 1928(b)(8); *see Williams v. Meredith*, 192 A.2d 924, 925 (Pa. 1937) ("[T]he long-established principle of universal application is that statutes in derogation of the common law must be strictly construed."); *Null v. Staiger*, 4 A.2d 883, 884 (Pa. 1939) ("we have … many times held that statutes in derogation of common law principles, … are subject to strict construction.").  Section 1928(a), conversely, instructs that the rule that statutes in derogation are to be strictly construed "shall have no application to the statutes of this Commonwealth enacted finally after September 1, 1937."  1 Pa.C.S. § 1928(a).  Finally, and relevant to the instant case, Section 1962 states that "[w]henever a statute is repealed and its provisions are at the same time reenacted in the same or substantially the same terms by the repealing statute, the earlier statute shall be construed as continued in active operation."  1 Pa.C.S. § 1962.

These rules of construction, taken together, dictate that where a post-1937 statute is a substantial reenactment of a pre-1937 statute, the earlier statute is viewed as continuing in operation and the rule of strict construction applicable to pre-1937 statutes continues to apply. In *Commonwealth v. Chiappini*, 782 A.2d 490 (Pa. 2001), *abrogated on other grounds by Commonwealth v. Kyle*, 874 A.2d 12 (Pa. 2005), this Court considered the scope of a statute regarding spousal privilege that was enacted in 1976 but was a substantial reenactment of a statute dating back to 1887. We explained the interaction between the provisions of the Statutory Construction Act as follows:

> At the outset, although [Section] 5914 was enacted in 1976 and made effective in June of 1978 as part of the Judicial Code, it is substantially a reenactment of legislation dating back to 1887, which itself had roots in the common law. At the time this precept was first incorporated into the Commonwealth's statutory law, the rules of construction held that statutes in derogation of the common law were to be strictly construed. Although this rule of construction has not been generally applicable since 1937, *see* 1 Pa.C.S. § 1928(a), it continues to apply to "[p]rovisions enacted finally prior to September 1, 1937 which are in derogation of the common law." 1 Pa.C.S. § 1928(b)(8). Another rule of statutory construction, 1 Pa.C.S. § 1962, indicates that "[w]henever a statute is repealed and its provisions are at the same time reenacted in the same or substantially the same terms by the repealing statute, the earlier statute shall be construed as continuing in active operation." Thus the rule of strict construction continues to apply[.]
>
> Properly understood, this rule of strict construction presumes that common law rules, as developed and refined by the courts, are to continue as before, and are altered or abrogated by a statute **only to the extent that the legislation specifically requires such a result**. If a circumstance does not plainly fall within the language of such a statute, the courts do not attempt to "interpret" or "discern legislative intent" in order to apply the statute. Rather, the statute does not come

> into play at all and the courts are to apply the common law rule.[10]

*Chiappini*, 782 A.2d at 492-93.[11]

---

[10] While overall our *Chiappini* decision was a plurality opinion, a majority of the members of the Court joined in the above-quoted discussion of statutory construction, i.e., that it must be presumed that a statute that is a substantial reenactment of a pre-1937 statute intends to effect no change on the common law beyond that which is expressly stated. *See Chiappini*, 782 A.2d at 507 (Saylor, J., concurring and dissenting) ("only such modification of the common law will be recognized as the statute clearly and definitely prescribes"); *id.* at 502 (Cappy, J., concurring and dissenting) (stating that he would adopt the statutory interpretation analysis of then-Justice Saylor). *Id.* at 503 (Castille, J., concurring and dissenting) (expressly "join[ing] in the majority opinion as to this holding").

[11] The JRA cites to *Bricklayers of Western Pennsylvania Combined Funds, Inc. v. Scott Development Co.*, 41 A.3d 16 (Pa. Super. 2012), *rev'd on other grounds*, 90 A.3d 682 (Pa. 2014), for the proposition that repealed and reenacted statutes should not be strictly construed in accordance with the common law because Section 1928(a) provides that strict construction is not required for statutes "enacted finally" after 1937 – and reenacted statutes are "enacted finally" at the time of reenactment (not at the time of the original enactment). JRA's Brief at 59 (citing *Bricklayers*, 16 A.3d at 27) ("Because the Mechanics' Lien Law of 1963 was 'enacted finally' in 1963, the statute must be liberally interpreted to effectuate its objects and promote justice. This proposition holds true irrespective of any conflicting affect that 1 Pa.C.S. § 1961 and 1 Pa.C.S. § 1962 may have on 1 Pa.C.S. § 1928(a) and (c), by permitting a repealed statute and its accompanying judicial interpretations to continue in active operation.")).

The aspect of *Bricklayers* relied upon by the JRA both is dicta and a misstatement of the law. First, the point on which the JRA relies is clearly dicta, as the intermediate appellate court recognized that the strict construction requirement had no application in that case because the "overarching provision at issue in this case, Section 1303(a) of the Mechanics' Lien Law of 1963, was not present in the Mechanics' Lien Law of 1901. Rather, Section 1303(a) of the Mechanics' Lien Law of 1963 was a first-time declaration of "existing decisional law," as opposed to a 'reenactment' of a previous statutory provision in the Mechanics' Lien Law of 1901." *Id.* at 26.

Second, to the extent to which the lower court otherwise indicated that the repealed and simultaneously reenacted statutes originally enacted prior to 1937 are not to be presumed to incorporate the common law, it is an incorrect statement of the law in that it is directly contrary to our holding in *Chiappini*, 782 A.2d at 492 ("Another rule of statutory construction, 1 Pa.C.S. § 1962, indicates that '[w]henever a statute is repealed and its provisions are at the same time reenacted in the same or substantially the same terms by the repealing statute, the earlier statute shall be construed as continuing in active operation.' **Thus the rule of strict construction continues to apply[.]")** (emphasis added).

As the overwhelming similarity of the language of the three statutes attests, Section 5610(e) of the present MAA is a codification of the voting standard in the 1945 MAA Act, which was in turn a reenactment of the voting standard in the 1935 MAA Act. As a result, Section 5610(e) must be strictly construed and thus presumed to follow the common law voting standard, unless its statutory language compels a contrary result.

Before continuing to this final stage of our interpretative analysis, we acknowledge that the three provisions of the Statutory Construction Act in play here incorporate some anachronisms that are in tension with the more commonly used general rule of statutory construction that in ascertaining the intent of the General Assembly, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(a), (b). In addition to enacting this more intuitive construction principle, however, the General Assembly also simultaneously promulgated specific provisions to address a unique circumstance, namely how to properly construct pre-1937 statutes that were repealed and simultaneously reenacted after 1937. In view of these rules this Court has held that when a statute is simultaneously repealed and reenacted, the effect is that the earlier statute was not in fact repealed, but rather that its provisions continue in active operation and must be interpreted based upon the legislative intent at the time of its original passage (i.e., pre-1937). *See, e.g., Bell v. Abraham*, 22 A.2d 753, 755 (Pa. 1941). Moreover, when enacting legislation the General Assembly is presumed to know the state of the law at that time. *Commonwealth v. McClintic*, 909 A.2d 1241, 1251–52 (Pa. 2006). Thus, when the General Assembly codified Section 5610(e) in 2001, we must presume that it knew that this provision was a reenactment (in substantially identical form) of a statute originally passed in 1935 and,

accordingly, that it would be interpreted by reference to Sections 1928(a), 1928(b)(8) and 1962 of the Statutory Construction Act.

In contravention of the rules of statutory construction that focus on the date of enactment of a law, the JRA contends that these three provisions have no application here because the language of Section 5610(e) is "facially clear and explicit" and thus does not require any resort to the Statutory Construction Act. JRA's Brief at 40-42 (citing inter alia, *Williams v. City of Philadelphia*, 188 A.3d 421, 428 (Pa. 2018) ("The analysis encompasses close adherence to terms of a statute that are plain and clear and resort to other approaches of discernment only in the presence of ambiguity or inexplicitness.")). According to the JRA, based upon dictionary definitions, the words "members present" in Section 5610(e) unquestionably refers to those members physically present at the Board meeting. *Id.* at 43-44. As such, the JRA contends that the Commonwealth Court's holding impermissibly added the words "and voting" to the description of which members should be counted when determining the number of votes needed to carry an action. *Id.* at 45. The JRA contends that because all sixteen members of the Board were in physical attendance at the meeting, nine votes were required to carry the vote.

We disagree with the JRA's assertion that the apparent facial clarity of the word "present," when divorced from the context in which it appears, precludes the application of Rules 1928(a), 1928(b)(8) and 1962, or, more precisely, that we must ignore the more focused and specific rules of statutory construction. 1 Pa.C.S. § 1933; *Commonwealth., Dept. of Transp., Bureau of Driver Licensing v. Campbell*, 588 A.2d 75, 79 (Pa. Commw. 1991) ("Where a general provision conflicts with a specific provision in the same or another statute, the specific provision shall prevail."). Moreover, Section 1901 of the

Statutory Construction Act provides no indication that any of its rules of construction are not to be applied in appropriate circumstances. 1 Pa.C.S. § 1901 ("In the construction of the statutes of this Commonwealth, the rules set forth in this chapter shall be observed, unless the application of such rules would result in a construction inconsistent with the manifest intent of the General Assembly."). The JRA cites to no authority in support of its position, including no case involving a simultaneous repeal/reenactment in which the rules of construction relating to the common law presumption were ignored based upon the alleged clarity of the reenacted statute. We note, for instance, that our recent decision in *Williams* did not involve a reenacted pre-1937 statute and made no reference to Sections 1928(a), 1928(b)(8) or 1962. In addition, we made clear that the use of the phrase "other approaches of discernment" was in reference to Section 1921(c), which sets forth eight types of external factors (e.g., the object to be obtained, legislative history) to be used when a statute is ambiguous. *Williams,* 188 A.3d at 428.

We thus move on to the final step in our construction analysis, determining whether the General Assembly intended to abrogate the common law presumption through its use of statutory language that "clearly and definitely prescribes" a different result. *See Chiappini*, 782 A.2d at 507 (Saylor, J., concurring and dissenting). Specifically, we must determine whether the General Assembly's direction that action may be taken by a majority of the "members present" was intended to abrogate the common law rule. Under the common law, a majority vote is a majority of the quorum unless more votes are cast. Further, under the common law, members who are present but do not vote are not included in determining how many votes are required for a majority but are instead

considered as acquiescing in the result declared by a majority of those who actually voted. *See, e.g., Munce v. O'Hara*, 16 A.2d 532, 533 (Pa. 1940).

To begin, we consider it significant that Section 5610(e) permits a municipal authority to amend its bylaws to require a larger number of votes to carry an action. The 1935 MAA Act, the 1945 MAA Act, and Section 5610(e) all contain language indicating that an action may be taken by a majority of members present "**unless the bylaws shall require a larger number**." 53 Pa.C.S. 5610(e) (emphasis added). This legislative authorization is an acknowledgement of the codification of the common law, which allows for a plurality to carry a vote but authorizes a municipal authority to modify its bylaws to establish a larger voting requirement if it so choses. If the JRA had intended that nine votes be required to carry any action (including in circumstances involving abstaining or recused members), it could have amended its bylaws to compel this change from the common law rule's simple majority standard. It did not do so.

As discussed, it is critical that the current MAA's voting standard was first enacted in 1935, and we have been instructed by the General Assembly in such circumstances to presume its intent for such statutes was to codify common law principles unless the language plainly reflected a result to the contrary. 1 Pa.C.S. § 1928(b)(8); *Chiappini*, 782 A.2d at 492-93; *In re Boles' Estate*, 173 A. 664, 665 (Pa. 1934) (the law presumes "that no change in the common law was intended beyond what is expressly stated," and "only such modification of the law will be recognized as the statute clearly and definitely prescribes."). At common law, as explained in detail above, mere presence at the time and location of the vote was insufficient as a matter of law to be counted as part of the total number from which a majority of the vote carried. In other words, for voting purposes,

presence under the common law also presupposes voting in order to be counted for purposes of obtaining a majority vote. *DiGiacinto*, 406 A.2d at 523. As such, for determination of a majority under the common law rule, "presence" and "voting" are synonymous with each other.[12] In setting forth the common law rule in the 1935 MAA, requiring a vote of a majority of those "present and voting" would have been an unnecessary redundancy; the General Assembly's use of "present" alone conveyed the incorporation of the common law rule for computation of a majority, rather than any intention of abrogating it.

The rationale for this rule is important for putting its application into context. At common law, actual voting was required to participate in a majority vote count because "if the rule were otherwise, a member could attend the meeting and abstain from voting and have a different effect than if that person were absent from the meeting." *Id.* at 522. In this case, it would mean that the outcome of the vote would depend upon the mere presence of six board members who had recused themselves from any participation in the operating contract award process (including all voting and discussions) based upon their own decision that they had conflicts of interest based upon business relationships with the JRA's current operator. R. 1797a-1807a. If a member cannot vote because of a conflict of interest, the same conflict of interest prevents including the disqualified members in the head count when tallying the outcome of the vote. Under the common

_____

[12] The *Pennsylvania Legislator's Municipal Deskbook* provides that in the absence of statutory language to the contrary, Pennsylvania follows the common law rules that "action may be taken by a majority of the members of the governing body present and voting as long as a quorum is present" and "with regard to the effect of abstaining from voting, unless otherwise specified in statute, a majority of the votes actually cast is all that is required for official action, so long as there is a quorum present." Local Government Commission, *Pennsylvania Legislator's Municipal Deskbook* at 43-45 (5th ed. 2017).

law, their non-participation in the vote precludes their mere presence when the vote was taken from being considered in the outcome.

The interpretation of the voting standard in Section 5610(e) in the MAA is an issue of first impression. The Commonwealth Court looked to this Court's decision in *Bagnoni,* 454 A.2d at 532, and its own decision in *McAdoo Borough,* 469 A.2d at 696, for the best available guidance on the construction of the MAA.

In *Bagnoni*, this Court evaluated the votes needed to override a veto under the Optional Third Class City Charter Law, which required a "two-thirds vote of the members" to override a mayor's veto. The question was whether the language meant two-thirds of the entire body or two-thirds of the members present. *Bagnoni*, 454 A.2d at 533. To aid in the construction, the Court first considered three related statutes, the First Class City Code, Second Class City Code, and the Borough Code. All three statues required a form of majority of all of the members entitled to vote, e.g., a "vote of three-fifths of all the members elected thereto" (First Class City Code), "a two-thirds vote of all the members thereof" (Second Class City Code), and a vote of "two-thirds of all the members elected to said council" (Borough Code). *Id.* at 533. The Court found that each of these statutes abrogated the common law rule, i.e., a majority of the members present, by including "an adjective to modify the word 'members' which expressly states the intention that a proportion of the whole number of members is required." *Id.* at 534. Consistent with these examples, the Court ultimately concluded that the optional Third Class City Charter Law required a vote of two-thirds of all of the member of city council. *Id.* at 37.

In significant contrast, the *Bagnoni* court examined a statute with language in keeping with that used in the MAA that did not constitute an abrogation of the common

law.  It cited to the Higher Education Assistance Agency Act, which provides that "unless a greater number is required by the by-laws of the agency, the act of a majority of the directors **present at any meeting shall be deemed the act of the Board**.  *Id.* (emphasis in original).  According to *Bagnoni*, this statute did not abrogate the common law rule that a "majority of those **voting** in the presence of a quorum can act for a board or other body in the absence of any language to the contrary in the relevant enabling statute.'"  *Id.* at 532 (emphasis modified).  The use of this language demonstrated that the "legislature also has the ability to use **clear language codifying the [c]ommon [l]aw [r]ule**, thus requiring only a majority of a quorum... ."  *Id.* at 533 (emphasis added).[13]

The JRA instead refers us to *Commonwealth ex rel. Swartz v. Wickersham*, 66 Pa. 134, 136 (1870) where a statute authorized the election of a county superintendent by "a majority of the whole number of directors present."  There were 112 directors in attendance, but one director abstained from voting.  One candidate obtained fifty-six votes, but this Court concluded that this did not constitute a majority under the applicable statute, as fifty-six votes did not constitute a majority of the "whole number of directors present."  The Court indicated that because the abstaining director remained, and thus

---

[13] In its decision, the Commonwealth Court observed that although in *Bagnoni* we did not expressly state that the word "present" should be construed as "present and voting," our indication that the "clear language" of quoted statute "codif[ied] the [c]ommon [l]aw [r]ule," dictates that conclusion may fairly be inferred.  *Seda-Cog,* 185 A.3d at 1238.

In *McAdoo*, the former Borough Code (Act of February 1, 1966, P.L. (1965) 1656, No. 581, 53 P.S. § 46001, repealed by the Act of April 18, 2014, P.L. 432, No. 37, § 3(2)), provided that "the borough could act 'by vote of the majority of council present at a meeting... .'"  *Id.* at 696.  The Commonwealth Court ruled that this statutory provision in no respect abrogated the common law.  *Id.*  Citing *Bagnoni*, the court further held that the common law provides "that a majority of those voting in the presence of a quorum can act for the body."  *Id.* at 696 n.8.

"being present, was entitled to be counted." The Court refused to deem the abstaining director "virtually absent," concluding that "[i]t would be dangerous to fritter away the express provision of the statute by construing an actual presence into a virtual absence." *Id.* at 136.

We do not find that *Swartz* constitutes persuasive authority to conclude that the reference to "present" in Section 5610(e) abrogates the common law rule, for two reasons. First, the statute in *Swartz* indicated that the majority had to be achieved from the "whole number" of directors present. This reference to the "whole number" itself constituted an abrogation of the common law rule that abstaining members are not counted when determining what number of members' votes constitutes a majority. *Bagnoni,* 454 A.2d at 534. Second, as the Commonwealth Court correctly acknowledged, the Court in *Swartz* did not consider whether language requiring affirmative votes of a majority of those "present" was sufficiently specific to supplant the common law. *Seda-Cog*, 185 A.3d at 1238. Specific consideration of the word "present" was not necessary because without more, the requirement of the "whole number" of members was a clear modification of the common law rule.

In conclusion, pursuant to the interpretive instructions in Section 1962 of the Statutory Construction Act, there is a presumption that Section 5610(e) constitutes a codification of the common law voting rules, and we further find no firm basis to conclude that the language of the statute clearly and definitely abrogates the common law voting standard. Under the common law, the phrase "members present" means voting members, as a non-voting member is not present for purposes of calculating a majority. Section 5610(e) incorporates the common law rule that when a quorum is present, action

may be taken by a simple majority of the quorum unless more votes are cast than the quorum number (in which case a majority of the votes cast carries the action.)  Section 5610(e) also does not expressly override the common law rule that those failing to vote are considered to have acquiesced in the action of the majority of those voting.  Given the equating of a present member with a voting member under the common law, use of the phrase "members present" does not "specifically require an abrogation of the common law." *Chiappini*, 782 A.2d at 493.  For the reasons set forth herein, we thus conclude that the Commonwealth Court was correct in its interpretation of Section 5610(e) and in its application of the presumption that reenactments of pre-1937 statutes are to be strictly construed in accordance with common law rules.

## C.  The Appropriate Standard of Review

The JRA contends that the scope of judicial review for discretionary action by municipal authorities is limited to situations involving flagrant and manifest abuses of discretion, and the standard of review is deferential.  JRA's Brief at 25 (citing, e.g., *Bucks Cnty. Servs. v. Phila. Parking Auth.*, 195 A.3d 218 (Pa. 2018)).  According to the JRA, judicial discretion should not be substituted for an authority's administrative discretion. *Id.* (quoting *Flaherty v. Port Auth. of Allegheny Cnty.*, 299 A.2d 613 (Pa. 1973) ("[J]udicial interference with the actions of municipal authorities should not be undertaken in the absence of proof of an abuse of power, bad faith, fraud or arbitrary and capricious action; the courts should be loath to review the details of the effectuation of actions of municipal authorities.")).  The JRA argues that the Commonwealth Court should have deferred to its (the JRA's) interpretation of Section 5610(e) requiring nine votes to effectuate any action with respect to a new operating agreement.

We cannot agree. First, the issue presented is one of statutory interpretation, a function entrusted to the judiciary. *HSP Gaming, L.P. v. City of Philadelphia*, 954 A.2d 1156, 1181 (Pa. 2008). To the extent that the JRA argues that this Court must defer to its interpretation of its governing statute, the argument is baseless. Moreover, none of the cases cited by the JRA provide a municipal authority with the discretion to ignore the requirements of a statutory provision to achieve an outcome that it prefers (in this case, a nine-vote majority). The clear language of Section 5610(e) provides that if a municipal authority wants to alter voting standards to require a larger number of votes to approve an action, it may do so by and through an amendment to its bylaws. 53 Pa.C.S. § 5610(e) ("all action may be taken by vote of a majority of the members present **unless the bylaws shall require a larger number**") (emphasis added). In its brief filed with this Court, the JRA does not contend that it has ever amended its bylaws to require a larger number of votes for approval of any action,[14] and in the absence of doing so it may not require a higher number of votes than that provided in Section 5610(e).

Finally, as Carload properly notes, the JRA filed a motion for summary judgment seeking to end the litigation in its favor. Carload's Brief at 35. In reviewing the trial court's grant of this motion for summary judgment, the Commonwealth Court applied the well-

---

[14] The trial court identified two bylaws that it considered significant. Section III.4 states that, "a majority of the Board shall constitute a quorum for purposes of transacting business," and Section VI.1 provides that in the event of a "conflict of interest[,]" "where approval by a majority of disinterested members constitutes less than a quorum, the member or members interested in the contract may be counted in determining the presence of a quorum, may briefly state a position on the contract or transaction, but such member or members may not vote on the matter." Trial Court Opinion, at 11-12. In their briefs filed with this Court, neither party argues that these provisions have any relevance to the issues presently before us, and we agree that they have no application here because the disinterested members constituted a quorum.

established standard of review with respect to summary judgment motions, namely that summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. As such, we do not conclude that the Commonwealth Court applied the wrong standard of review in assessing whether the JRA was entitled to the relief that it sought in this case.

**D. The RFP Process as a Proprietary Function**

The JRA next argues that its RFP process to award a new operating agreement was a proprietary function, rather than a governmental function, and that as a result the Commonwealth Court should have deferred to its (the JRA's) preferred interpretation of Section 5610(e). JRA's Brief at 36-38. The JRA also notes that the MAA expressly authorizes the JRA to engage in contracting for the purpose of carrying on its business, 53 Pa.C.S. § 5607(d)(13), and that the new operating agreement will generate revenue, which will then be re-invested into capital projects throughout the eight-county region. JRA's Brief at 35. As a result, the JRA insists that its RFP process was a "voluntarily-undertaken procurement process for professional rail services and that reservation of rights provisions in the RFP document gave it "the right to impose conditions upon any contract award" and "'the final word on questions of interpretation in the RFP process." *Id.* at 30-31.

The Commonwealth Court properly rejected these contentions, indicating that the JRA could not rely on a "boilerplate reservation of rights provision to disclaim" its obligation to adhere to the process set forth in the RFA document. *Seda-Cog*, 185 A.3d at 1239. The JRA does not cite to any authority for the proposition that municipal agencies do not have to follow the voting standards in Section 5610(e) when engaging in

proprietary (as opposed to governmental) functions. We note that Section 5610(e) expressly provides that "… all action may be taken by a majority of the members present." The JRA likewise cites to no authority providing that when engaging in proprietary functions, it has any discretion to interpret provisions of the MAA. The Commonwealth Court correctly held that the JRA could not impose a different voting standard through its own interpretation of its RFP. Neither the RFP nor the JRA's bylaws provided any indication to candidates that nine votes would be required for actions related to the award of the operating agreement. *Id.* at 1239. Again, Section 5610(e) gave the JRA the ability to amend its bylaws to adopt a different voting requirement (including, if it so chose, in connection with proprietary RFP processes), but the JRA did not do so. In the absence of a bylaw so providing, the JRA had no discretion to implement a voting standard contrary to that set forth in Section 5610(e). *See, e.g., Lasday v. Allegheny Cnty.*, 453 A.2d 949 (Pa. 1982).

### E. Undermining Support for the Member Counties

Finally, the JRA contends that the Commonwealth Court's interpretation of Section 5610(e) would have the effect of permitting a plurality of the members of the Board to award the operating agreement, a result that would "disenfranchise much of the region's representation on the JRA." JRA's Brief at 65. The JRA notes that some of its Board members testified at depositions that they desired to avoid this scenario of plurality approval of an action that would "determine the fate of an eight-county authority." *Id.* at 66. According to the JRA, the Commonwealth Court's interpretation "undermines the broad representation built into the JRA's repeatedly-announced [nine vote] voting standard." *Id.* ("As long as the Board members showed up at meetings, all of the

appointing counties were assured that the region was protected from a mere plurality vote on a significant contract, impacting rail service throughout Central Pennsylvania and all eight member Counties.").

The MAA contains provisions to provide for equal representation on the boards of multi-member authorities.[15] Section 5610(a)(2) provides that for authorities incorporated by two or more municipalities, each of its members shall have equal representation on the board, 53 Pa.C.S. § 5610(a)(2). Section 5610(e) gives an authority's board the power to "prescribe, amend and repeal bylaws, rules and regulations governing the manner in which the business of the authority may be conducted" and to amend its bylaws to require a greater number of votes to constitute a majority, thereby preventing action by a plurality of its members. As such, if a multiple-member authority (like the JRA) desires to institute more "representational fairness" than equal Board representation provides, it may change its bylaws to do so. Often repeating that there is a nine member majority requirement is meaningless where the bylaws were never amended to effectuate it.

In support of its contention that the MAA reflects a "goal of adequate representation," the JRA cites to *Stoltz*, a case decided pursuant to the Metropolitan Transportation Authorities Act of 1963 (MTAA),[16] the enabling act for the Southeastern Pennsylvania Transportation Authority ("SEPTA"). *Stoltz*, 373 A.2d at 1100-01. SEPTA

---

[15] Municipal authorities created and organized under the MAA may consist of only a single member or may have multiple members. Section 5603, which sets forth the requirements for incorporation of a municipal authority, provides that "[w]henever the municipal authorities of any municipality **singly or of two or more municipalities jointly** desire to organize an authority under this chapter, they shall adopt a resolution or ordinance signifying their intention to do so." 53 Pa.C.S. § 5603(a).

[16] Act of August 14, 1963, P.L. 984, § 1.

is governed by a board consisting of representatives of eleven southeastern counties with widely disparate populations. Section 18(a) of the MTAA differs in at least two significant regards from Section 5610(e) of the MAA. First, its voting standard requires that "[a]ll action of the board shall be by resolution and the affirmative vote of a majority of all the members shall be necessary for the adoption of any resolution." *Id.* at 1100. Second, Section 18(a) contains significant safeguards to ensure that votes are representational for all of the counties represented on the board, including that no action by the board to which an express objection has been made by a board member or members representing a county or counties having one-third or more of the population of the metropolitan area, as determined by the most recent decennial census, shall be carried unless supported at a subsequent regular meeting of the board by the votes of at least three-quarters of the membership of the board. *Id.* at 1097.

The JRA does not explain how these expansive and detailed provisions of the MTAA have any bearing on a need to guarantee additional "representational fairness" under the MAA. Unlike the MAA, the MTAA's voting standard (requiring a "majority of **all** the members") is clearly an abrogation of the common law rule that a majority of those members "present and voting" are necessary to effectuate board actions, as this Court so held. *Id.* at 1100. Section 18(a) contains no provision permitting SEPTA to change its bylaws to adopt a different voting standard, and Section 5610(e) contains no provisions that reflect any intention on the part of the General Assembly to require the extent of representational voting contemplated under the MTAA. Again, the members of the JRA Board, who now claim to have a clear opposition to passage of any action based upon a vote of a mere plurality of the Board, could have, in accordance with the express language

of Section 5610(e), amended its bylaws to require nine votes. It could also have amended its bylaws to provide for the types of additional representational fairness as the General Assembly set forth in the MTAA.

We further note that the circumstances of the present case do not demonstrate a lack of representation of the majority of the counties comprising the JRA. While two of the abstaining Board members were from Columbia County, the other seven counties had at least one Board member who voted on the award of the operating agreement, and a Board member from six of those seven counties voted in affirmance of awarding the operating agreement to Carload. The JRA offers no explanation as to why the present circumstances reflect a lack of representation, other than that the seven affirmative votes constituted a plurality of the sixteen member Board.[17] Under the common law voting standard, however, all that is required is that the vote is a majority of the votes cast, even if the number of votes cast only constitutes a plurality. *See, e.g., DiGiacinto*, 406 A.2d at 522.

The Commonwealth Court's decision is affirmed.

Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Wecht files a concurring opinion.

Chief Justice Saylor files a dissenting opinion in which Justice Mundy joins.

---

[17] To the extent that the JRA is suggesting that no vote can carry unless each of the counties has at least one of its representative members taking part in the vote, merely precluding an action to pass by a plurality vote does not rectify the problem. In this regard, we note that even the requirement of a nine vote majority does not guarantee this type of "representational fairness" among the counties. On a sixteen member Board with each of the eight counties having two votes, the affirmative votes of as few as five counties could meet the nine vote requirement.